# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LESLIE BIRTIG,                )
                              )
        Plaintiff,        )   Civil Action No. 14-565
                              )
   v.                         )
                              )
CAROLYN W. COLVIN,            )
Acting Commissioner of Social Security, )
                              )
        Defendant.        )

## MEMORANDUM OPINION

**NORA BARRY FISCHER, District Judge.**

## I. INTRODUCTION

Leslie Birtig ("Plaintiff"), brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*. (the "Act").[1] This matter comes before the Court on cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. (ECF Nos. 7, 9). The record has been developed at the administrative level. (ECF No. 5).[2] For the following reasons, Plaintiff's Motion for Summary Judgment (ECF No. 7) is denied and Defendant's Motion for Summary Judgment (ECF No. 9) is granted.

## II. PROCEDURAL HISTORY

Plaintiff filed her application on March 4, 2011 claiming disability since June 2, 2003 due to degenerative joint disease, anxiety, chronic migraines, diabetes, arthritis, spinal stenosis,

---

[1] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Carayiannas v. Colvin*, 2014 WL 582393 at *1 (M.D.Pa. 2014). A claimant is required to prove that she became disabled prior to the expiration of her insured status. 42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.130; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). Here, it is undisputed that the relevant time period at issue in this case is from June 2, 2003 (Plaintiff's alleged disability onset date), through December 31, 2008 (her date last insured). (R. at 12).

[2] References to the administrative record (ECF No. 5), will be designated by the citation "(R. at ___)".

1

osteoporosis, asthma, balance problems, hearing problems in her right ear, and depression. (R. at 54-55, 162). Her application was denied (R. at 69-73), and she requested a hearing before an administrative law judge ("ALJ"). (R. at 74-75). A hearing was held on September 12, 2012, wherein Plaintiff appeared and testified, and Samuel Edelmann, an impartial vocational expert, also appeared and testified. (R. at 26-53). On October 16, 2012 the ALJ issued a written decision denying benefits. (R. at 12-21). Plaintiff's request for review by the Appeals Council was denied (R. at 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). She filed her complaint challenging the ALJ's decision on May 2, 2014 (ECF No. 1), and the parties subsequently filed cross-motions for summary judgment. (ECF Nos. 7, 9). Accordingly, the matter has been fully briefed and is ripe for disposition.

## III. BACKGROUND

### A. *General Background*

Plaintiff was fifty-five years old on her alleged onset date and sixty-one years old on her date last insured. (R. at 54). She is a college graduate, and has certificates in Human Resource Management and Nursing Home Administration. (R. at 32, 163). Plaintiff worked as the Development Director at a radio station, a Unit Clerk/Activities Assistant at a nursing home, and as the Executive Director of the Pittsburgh Zoo. (R. at 40-45, 64).

### B. *Medical Background*[3]

#### *Knee impairment*

Plaintiff was treated by Eric Nabors, M.D. for her various musculoskeletal complaints. An MRI of Plaintiff's right knee dated January 14, 2005 revealed findings compatible with a lateral meniscus tear and some joint effusion. (R. at 434). A bone scan dated July 1, 2005 revealed increased activity in the knees, consistent with degenerative change or arthritis. (R. at 439). Plaintiff had arthroscopic surgery of her right knee in 2005, and on January 23, 2006, Dr. Nabors found Plaintiff had some swelling and diffuse tenderness on examination. (R. at 569). Plaintiff subsequently underwent Synvisc injections, and by May 2006 she reported to Dr.

---

[3] Plaintiff challenges the ALJ's evaluation of the medical evidence with respect to her hip, right knee, right shoulder, back and mental impairments. The Court has confined its discussion of the medical evidence accordingly.

2

Nabors that her knee felt "quite good" and she had no pain. (R. at 556, 567). Physical examination revealed moderate misalignment of her right knee, and she exhibited full motion on extension and 130 degrees on flexion. (R. at 556). X-rays showed bone-on-bone changes at the lateral compartment, but Dr. Nabors reported Plaintiff was only mildly symptomatic and knee replacement was not justified. (R. at 556).

In January 2008, Plaintiff was seen by Dr. Nabors and complained of right knee pain that interfered with her daily activities. (R. at 401). She informed Dr. Nabors that she wanted to undergo a total knee replacement. (R. at 401). On physical examination, Dr. Nabors reported that Plaintiff walked with a valgus deformity, flexed to approximately 130 degrees, and lacked the last several degrees on full extension. (R. at 401). She had no ligamentous laxity to varus stress, and she was neurologically intact in the lower extremities. (R. at 401). Plaintiff subsequently underwent total right knee replacement surgery and tolerated the procedure well. (R. at 418-419). Upon examination in March 2008, Plaintiff exhibited a good range of motion and had minimal pain. (R. at 516). When seen on January 13, 2009, Dr. Nabors reported that Plaintiff had done well following knee replacement surgery until she fell on her knee two weeks prior. (R. at 508). Plaintiff had no trouble walking and her pain was improving. (R. at 508). On physical examination, Dr. Nabors reported that Plaintiff had normal posture and walked with a normal gait. (R. at 508). She had some mild tenderness to palpation, but no laxity to varus, valgus, anterior or posterior stressing. (R. at 508). She was able to flex to 130 to 140 degrees and extend to neutral. (R. at 508). Dr. Nabors diagnosed Plaintiff with lateral knee sprain with no instability following knee replacement, and found nothing to suggest any ligament disruption, tenderness, rupture or fracture. (R. at 508). He stated Plaintiff's injury would heal spontaneously and no further evaluation or treatment was required. (R. at 508).

*Hip impairment*

Plaintiff's bone scan dated July 1, 2005 showed moderate intense activity in the left hip consistent with degenerative change or arthritis. (R. at 439). On February 27, 2007, Plaintiff complained of left hip and groin pain and was walking with a cane. (R. at 567). Dr. Nabors reported that her x-rays revealed a complete loss of articular cartilage of the left hip which had

3

markedly increased since May 2005. (R. at 567). Physical examination showed a limited range of motion of her hip with no internal rotation, external rotation of 20, flexion of 90 and extension minus 15. (R. at 567). Plaintiff subsequently underwent a total left hip replacement on March 30, 2006. (R. at 388-389). At her follow-up visit with Dr. Nabors on April 28, 2006, Plaintiff reported that she was "quite pleased" with the results and was pain free. (R. at 558). On physical examination, Dr. Nabors reported that Plaintiff walked without a limp and used a walker, but was able to walk without the walker, and her leg lengths were equal. (R. at 558). Plaintiff's x-rays revealed that her hip components were in "excellent position", and Dr. Nabors reported that Plaintiff had "done well" with surgery and was not experiencing "any problems." (R. at 558). When seen by Dr. Nabors on May 30, 2006, Plaintiff reported some mild lateral tenderness, but her preoperative pain was gone and she was "quite pleased." (R. at 556). Physical examination revealed mild tenderness, but no pain with active or passive range of motion, and her leg lengths were equal. (R. at 556). Dr. Nabors found she was "doing quite well", and stated she could discontinue her cane usage and post-operative precautions. (R. at 556). He indicated that Plaintiff should try and avoid internal rotation. (R. at 556). On June 26, 2006, Plaintiff complained of left hip pain after falling off a chair. (R. at 554). Dr. Nabors reported that Plaintiff had a left hip bruise but there was no evidence of injury to her hip replacement. (R. at 554).

On February 12, 2007, Plaintiff reported to Dr. Nabors that she continued to do well following her hip replacement surgery but had recently fallen on her left hip after a piece of luggage fell on her. (R. at 543). Plaintiff complained of pain in her left buttock and thigh, but x-rays revealed no injuries or abnormalities. (R. at 543). On physical examination, Dr. Nabors reported that Plaintiff had no pain on range of motion testing, but had moderate tenderness to palpation of her lateral hip. (R. at 543). No bruising or swelling was found, and her lower extremities were neurologically intact to motor testing. (R. at 543). She was diagnosed with contusion and anti-inflammatory medication was recommended. (R. at 543). At her one year follow-up for evaluation of her left hip, Dr. Nabors reported that Plaintiff had no complaints or pain, and was "happy" with the results of her surgery. (R. at 537). On physical examination,

4

Plaintiff walked with a normal posture and gait, she had no pain with range of motion of her hip, and her leg lengths were normal. (R. at 537). X-rays revealed no abnormalities, and Dr. Nabors reported that Plaintiff was "doing well from her surgery." (R. at 537). When seen by Dr. Nabors for knee complaints in January 2008, he reported that Plaintiff had "done quite well" following hip replacement surgery. (R. at 401). On August 4, 2008, Plaintiff returned to Dr. Nabors and complained of left hip pain, but stated it was not incapacitating or severe. (R. at 512). Plaintiff walked with a normal posture and gait, and she had no pain with range of motion of her left hip. (R. at 512). X-rays of her left hip revealed no abnormalities and Dr. Nabors was of the view that her pain was related to one of her abdominal muscles and saw no reason for any further evaluation of her hip. (R. at 512).

*Shoulder impairment*

Plaintiff complained of right shoulder pain when seen by Dr. Nabors on June 26, 2006. (R. at 554). On physical examination, Plaintiff had pain with overhead activity of her right shoulder, but was able to reach above her head. (R. at 554). She was diagnosed with right shoulder impingement syndrome. (R. at 554). On August 29, 2007, Plaintiff complained of right shoulder pain and x-rays showed only mild AC joint changes. (R. at 533). She had a positive supraspinatus sign and a positive impingement sign, but had a full range of motion. (R. at 533). She was diagnosed with right shoulder impingement and received injection therapy. (R. at 533).

An MRI of Plaintiff's right shoulder dated January 16, 2008 revealed marked degenerative changes and a partially torn biceps tendon. (R. at 461). Plaintiff complained of left shoulder pain in March 2008, but x-rays showed minimal degenerative changes and she had a good range of motion with minimal pain. (R. at 516). Plaintiff subsequently underwent an elective right shoulder arthroplasty on May 22, 2008 (R. at 377-380). Plaintiff reported a history of increased pain and decreased mobility approximately six months prior to surgical intervention. (R. at 409). Prior to surgery, physical examination showed some decreased range of motion of Plaintiff's upper extremity and lower extremity, secondary to her surgical history, and her gait was slow but steady. (R. at 411).

When seen for follow-up on July 21, 2008, Plaintiff had no specific complaints and her pain was minimal. (R. at 513). X-rays revealed a "nicely aligned" prosthesis and on physical examination, Plaintiff demonstrated 175 degrees of forward flexion and 150 degrees of active forward flexion. (R. at 513). Her treating physician reported that Plaintiff had a "great range of motion." (R. at 513). She was instructed to continue with home exercise and return in six weeks. (R. at 513). On October 31, 2008, Plaintiff's only complaint was a lack of internal rotation and reported "very little if any" shoulder pain. (R. at 510). On physical examination, Plaintiff demonstrated 180 degrees of forward flexion, 60 degrees of external rotation, and internally rotated to L3. Her treating physician stated "[o]verall nice result." (R. at 510).

Plaintiff fell following her date last insured and on January 2, 2009, she complained of pain in the lateral aspect of her arm. (R. at 509). X-rays of her shoulder showed a well-seated prosthesis with no evidence of any superior migration. (R. at 509). She exhibited full range of motion on all planes actively and passively and had no shoulder instability. (R. at 509). Her physician was of the view that Plaintiff had a possible rotator cuff tear and ordered an arthrogram. (R. at 509).

*Back impairment*

An MRI of Plaintiff's lumbar spine dated May 21, 2005 showed mild diffuse disc bulge at the L4-L5 level, with some moderate degenerative changes of the facet joints at L5-S1 level, but no disk herniation was identified. (R. at 438). When seen by Dr. Nabors after the piece of luggage fell on her in February 2007, Dr. Nabors noted that Plaintiff had a history of back pain, but she reported no back pain and stated that she had not had "any problems" prior to the incident. (R. at 543). When seen by Dr. Nabors on August 29, 2007, x-rays of her lumbar spine showed a grade 1 spondylolisthesis of the L4-5, with marked degenerative changes of L4-5 and L5-S1, "pretty mild" scoliosis, and no compressive lesions. (R. at 533). Straight leg raise testing and movement of the right hip caused low back pain. (R. at 533). Plaintiff was diagnosed with spondylolisthesis and degenerative disk disease of the lumbar spine causing back and right hip pain. (R. at 533). Physical therapy was recommended. (R. at 533).

*Mental impairment*

Plaintiff's treatment records sporadically reference that she was prescribed Xanax and/or Effexor for anxiety and depression during the relevant time period. (R. at 366, 374, 378, 379). There is no evidence in the administrative record of any mental health treatment by a mental health treatment provider during the relevant time frame. In her Function Report submitted to the Agency in conjunction with her application for DIB, in response to the instruction "Check any of the following items that your illnesses, injuries, or conditions affect," Plaintiff left unchecked the following categories: memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (R. at 179).

*State agency assessments*

On June 14, 2011, Monica Yeager, Psy.D., a state agency reviewing psychologist, reviewed the psychiatric evidence of record and concluded that Plaintiff had only mild restriction in her activities of daily living and social functioning, and mild difficulties in maintaining concentration, persistence and pace. (R. at 60). She observed that Plaintiff alleged anxiety, but there was no mental health information in the record prior to Plaintiff's date last insured. (R. at 59). Dr. Yeager concluded that Plaintiff's mental health impairment was non-severe. (R. at 60).

On June 17, 2011, Mary Ellen Wyszomierski, M.D., a state agency reviewing physician, reviewed the medical evidence of record and opined that Plaintiff could occasionally lift/carry ten pounds, frequently lift/carry less than ten pounds, stand/walk for a total of two hours in a workday, and sit for a total of six hours in a workday. (R. at 61). In Dr. Wyszomierski's view, Plaintiff could occasionally climb ramps/stairs, balance, stoop and crouch, but never climb ladders/ropes/scaffolds, kneel or crawl, and was limited in right overhead reaching. (R. at 61-62).

C. *Administrative Hearing*

Plaintiff and Samuel Edelmann, an impartial vocational expert, testified at the hearing held by the ALJ on September 12, 2012. (R. at 26-53). Plaintiff testified that prior to her date last insured, she suffered from diabetes causing her to be extremely tired, weak, thirsty and wobbly. (R. at 35). She further testified that she had left hip, right knee and right shoulder

7

replacement surgeries. (R. at 34). Plaintiff indicated that prior to knee surgery, her knee would lock up and she was unable to get up from the ground. (R. at 36). Plaintiff testified that she also suffered from balance problems during the relevant time frame, and stated that she walked into walls and fell over chairs. (R. at 38). She stated that she worked for a photographer friend two years prior for approximately six months doing staging, but he told her she staggered like a drunk and could not do the work. (R. at 39). Plaintiff did not testify to any limitations resulting from her claimed mental impairments.

The vocational expert was asked to describe Plaintiff's past work experience in terms of skill and exertional level. (R. at 46). The vocational expert testified that Plaintiff's radio manager job was light and skilled, the zoo job was light and skilled, and the unit clerk job was light and medium skilled. (R. at 46). The vocational expert further testified that the skills required in those jobs would be transferrable to a sedentary job, such as a community planning director, including the position of a social community service manager. (R. at 47-48).

## IV. STANDARD OF REVIEW

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1) (A); *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. § 404.1520.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R.

§ 404.1520(a)(4); *see Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence exists in the record to support the Commissioner's findings of fact. *Hagans*, 694 F.3d at 292.

Substantial evidence is "more than a mere scintilla but may be less than a preponderance." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545 (3d Cir. 2003). It means "such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Davis v. Astrue*, 830 F. Supp. 2d 31, 34 (W.D.Pa. 2011). When considering a

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business[.]

42 U.S.C. § 405(g).

[5] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Mussi v. Astrue*, 744 F.Supp.2d 390, 404-05 (W.D.Pa. 2010) (quoting *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998)); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion ... so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Med. Ctr. v. Sebelius*, 566 F.3d 368, 373 (3d Cir. 2009) (quoting *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d. Cir. 1986)).

## V. DISCUSSION

In her decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 2, 2003. (R. at 14). The ALJ further found that Plaintiff's osteoarthritis, status post right knee replacement, status post right should arthoplasty, status post left hip replacement and degenerative disc disease of the lumbar spine were severe impairments, but determined at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404 Subpt. P, App. 1 of the regulations. (R. at 14-15). Despite her impairments, the ALJ found that through her date last insured, she had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a).[6] (R. at 15). At the final step, the ALJ concluded that, based on the testimony of the vocational expert, Plaintiff could perform sedentary jobs that exist in significant numbers in the national economy. (R. at 20-21).

---

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

Again, the Court must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff argues that the ALJ erred in failing to include in her RFC assessment the limitations found by Dr. Wyszomierski, the state agency reviewing physician, who was of the view that Plaintiff could only occasionally climb ramps/stairs, balance, stoop and crouch, never climb ladders/ropes/scaffolds, kneel or crawl, and was limited in right overhead reaching. (R. at 61-62). "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 404.1527(e) (2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001). Moreover, the ALJ's RFC finding must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Id.* (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).

Plaintiff argues that the medical record supports Dr. Wyszmierski's postural/reaching limitations, citing to select treatment note entries referencing limited ranges of motion on occasion with respect to her knee, hip, and shoulder impairments. (ECF No. 8 at p. 6). Rather than limiting her discussion to a select few treatment note entries set forth by the Plaintiff in her Brief, however, the ALJ reviewed and discussed numerous treatment note entries by Dr. Nabors that were inconsistent with Dr. Wyszomierski's limitations. For example, the ALJ observed that following hip surgery, Plaintiff was pain free, pleased with the results, and able to walk without a limp. (R. at 17). One year post status hip surgery, Plaintiff continued to be happy with the results, walked with a normal posture and normal gait, and had no pain with range of motion testing. (R. at 17). In January 2008 treatment note entries reflect that Plaintiff had "done quite well" following hip surgery. (R. at 18). The ALJ further observed that in March 2008, Dr.

11

Nabors' physical examination revealed good range of motion of her left shoulder, right hip and left knee with minimal pain. (R. at 18). Following right shoulder surgery, the ALJ noted that Dr. Nabors opined that Plaintiff had "great range of motion." (R. at 18). Subsequent physical examinations continued to show "nice results." (R. at 18).

Plaintiff cites to *Gizienski v. Colvin*, 2014 WL 3700487 at *5 (W.D.Pa. 2014), *Mistick v. Colvin*, 2013 WL 5288261 at *2-3 (W.D.Pa. 2013), *Kobulnicky v. Astrue*, 2013 WL 1290955 at *6 (W.D.Pa. 2013), *Gority v. Astrue*, 2011 WL 1225708 at *6 (W.D.Pa. 2011) and *Guyer v. Astrue*, 2009 WL 482245 at *3-4 (W.D.Pa. 2009), wherein a remand was ordered because the ALJ failed to include and/or address findings regarding a claimant's postural or manipulative limitations, and/or failed to resolve conflicts in the evidence regarding a claimant's limitations. These cases are inapposite, however, since the ALJ here did not fail to address and/or discuss findings, nor did the ALJ fail to resolve conflicts in the medical evidence in rejecting the limitations imposed by Dr. Wyszomierski. *See e.g., Clutter v. Colvin*, 2014 WL 4231297 at *1 n.1 (W.D.Pa. 2014) (finding cited cases distinguishable on grounds that ALJ did not ignore evidence or fail to resolve conflicts in evidence). To the contrary, the ALJ exhaustively reviewed the medical evidence of record, thoroughly discussed the physical examination findings of Dr. Nabors with respect to Plaintiff's various physical impairments, and adequately explained her reasons for rejecting the postural/reaching limitations, stating:

> Overall, the cumulative objective evidence indicates multiple severe musculoskeletal problems existing after the claimant's alleged onset date and through her date last insured of December 31, 2008, but none that resulted in disabling symptoms persisting for at least 12 consecutive months, which is required for a finding of disability under the Act (SSR 82-52). I give some weight to the finding by the State non-examining medical consultant below that the claimant was capable of performing sedentary work as of the date last insured (Exhibit 1A); however, I do not believe that the postural limitations or other limitations assessed, reducing the claimant's functional capabilities below a full range of sedentary work are supported by the cumulative record (Exhibit 1A). There is little evidence on ongoing balance problems, and no etiology for an impairment that would result in this condition, prior to December 31, 2008, and the claimant remained capable of overhead reaching and activities such as carrying groceries even into 2009, despite her shoulder impairment, which

12

> initially responded well to surgery. Dr. Nabors' cumulative examination findings
> in no way would preclude the performance of a full range of sedentary work.
>
> Thus, a limitation to the full range of sedentary work adequately accommodates
> the claimant for all functional limitations reasonably related to her medically
> determinable impairments existing as of December [31], 2008. No further
> limitations are warranted by the cumulative credible evidence of record.

(R. at 19). The ALJ appropriately considered Dr. Wyszmierski's opinion in conjunction with the medical and other evidence and her findings in this regard are supported by substantial evidence. *See Wilkinson v. Colvin*, 558 F. App'x 254, 256 (3d Cir. 2014) (rejecting claimant's argument that the ALJ erred in failing to include postural limitations where the ALJ "cited to other record evidence that was inconsistent with Dr. Ali's finding of postural limitations, including medical reports that Wilkinson was doing well, had good leg and arm strength, and Wilkinson's own record of his daily activities.").

Alternatively, even assuming that the ALJ erred in her treatment of the postural/reaching limitations, any such error was harmless. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3rd Cir. 2005) (holding that where error by ALJ is harmless and would not affect the outcome of the case, remand is not warranted); *Bovell v. Barnhart*, 2006 WL 1620178 at *2 n.5 (E.D. Pa.2006) ("Even assuming this omission was in error, the jobs suggested by the VE do not mention exposure to vibration and so any failure to omit a vibration limitation is harmless."). Dr. Wyszomierski opined that Plaintiff could occasionally climb ramps/stairs, balance, stoop and crouch, but never climb ladders/ropes/scaffolds, kneel or crawl, and was limited in right overhead reaching. (R. at 61-62). The vocational expert testified that an individual with the Plaintiff's RFC as assessed by the ALJ could perform the sedentary job of a community planning director. (R. at 47-48). Importantly, the postural limitations imposed by Dr. Wyszomierski are not implicated in the performance of this job. The community planning director position requires no climbing, balancing, stooping, kneeling, crouching, crawling or reaching. *See Dictionary of Occupational Titles*, § 187.167-234 (climbing, balancing, stooping, kneeling, crouching, crawling, reaching "[n]ot present"). Accordingly, any potential erosion of the

13

sedentary occupational base contemplated by SSR 96-9p and argued as a basis for remand by the Plaintiff, is simply not implicated in this case and thus a remand is not required on this basis.

Plaintiff next claims that the ALJ erred in failing to consider her non-severe mental impairments in combination with her severe impairments in fashioning her RFC. (ECF No. 12-13). Specifically, Plaintiff argues that the ALJ "never addressed or considered whether the combined impact of [Plaintiff's] severe pain with her non-severe mental impairment might result in concentration limits, as it arguably may limit her to simple routine work." (*Id.* at p. 13). This argument merits little discussion since it is unsupported by the record. In her decision, the ALJ specifically addressed Plaintiff's mental impairments, as well as her reasons for not including any functional limitations with respect thereto:

> …[A]lthough the record indicates the claimant was taking Xanax and Effexor for anxiety, she did not undergo any mental health treatment during the relevant time period, and there are no indications of severe mental health symptoms resulting in functional deficits (Exhibits 6F and 7F).

(R. at 16). Plaintiff does not point to any medical evidence that the ALJ rejected outright or failed to consider with respect to her alleged mental impairments. Nor does she point to any particular mental limitation supported by the medical evidence that the ALJ failed to include in her RFC assessment. Plaintiff herself did not claim any mental limitations (R. at 179), nor did her attorney propound any mental limitations to the vocational expert at the administrative hearing. (R. at 50-51). Finally, the Court observes that the record is devoid of any evidence, medical or otherwise, that Plaintiff's alleged mental impairments affected her ability to concentrate. Accordingly, the ALJ's findings with respect to the Plaintiff's mental impairments are supported by substantial evidence and the Court finds no error in this regard.

Finally, Plaintiff argues that the ALJ erred in failing to account for her long work history in the ALJ's credibility assessment. (ECF No. 8 at pp. 13-14). An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 29 C.F.R. § 404.1529(a); *Hartranft v. Apfel,* 181 F.3d 358, 362 (3d Cir. 1999). "When a claimant has worked for a long period of time, [her] testimony about [her] work capabilities should be

14

accorded substantial credibility." *Rieder v. Apfel*, 115 F. Supp. 2d 496, 505 (M.D.Pa. 2000) (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979)). Prior work experience is, however, only one of many factors an ALJ must consider in assessing the credibility of a claimant's subjective complaints of disabling pain. 20 C.F.R. § 404.1529(c)(3). In assessing subjective complaints, SSR 96-7p and the regulations provide that the ALJ should consider the objective medical evidence as well as other factors such as the claimant's own statements, the claimant's daily activities, the treatment and medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record. 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186 at *2. As the finder of fact, the ALJ can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

Here, contrary to the Plaintiff's contention, the ALJ did, in fact consider the Plaintiff's work history in the credibility calculus. The ALJ discussed the Plaintiff's work history in detail during her discussion with and questioning of the vocational expert. (R. at 47-50). The ALJ further discussed Plaintiff's work history in connection with her finding that Plaintiff could not perform her past relevant work. (R. at 19). Finally, the ALJ stated that she carefully considered the entire record in assessing the Plaintiff's RFC, which necessarily subsumes the credibility determination.

Moreover, the Court notes that a claimant's work history alone is not dispositive of the credibility question, and an ALJ is not required to equate a long work history with enhanced credibility, particularly where, as here, the ALJ found that the Plaintiff's claimed limitations during the relevant time period were not supported by the medical evidence of record. *See e.g. Polardino v. Colvin*, 2013 WL 4498981 at *5 (W.D.Pa. 2013) (finding remand not required and rejecting plaintiff's argument that she was entitled to a favorable credibility inference based upon her excellent work history where it was clear from the ALJ's decision that he considered record

15

as a whole in assessing plaintiff's credibility); *Christl v. Astrue*, 2008 WL 4425817 at *12-13 (W.D.Pa. 2008) (observing that where there are inconsistencies between a plaintiff's testimony and the medical records that undercut the claimant's credibility, courts have distinguished *Dobrowolsky*, even if the ALJ failed to explicitly discuss work history in the opinion).

In sum, the ALJ considered Plaintiff's subjective complaints in light of the medical evidence and all the other evidence of record, and thoroughly explained in her decision why her allegations of disabling pain and/or limitations were not supported by the record, specifically the objective medical findings and by the Plaintiff's own activities. All of these findings are supported by substantial evidence, and accordingly, the Court finds no error in the ALJ's credibility determination.

## VI. CONCLUSION

Based upon the foregoing, the ultimate decision by the ALJ to deny benefits to Plaintiff was adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment (ECF No. 7) is denied, Defendant's Motion for Summary Judgment (ECF No. 9) is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

October 23, 2014

cc/ecf: All parties of record.